**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 24-CV-7025 |
| v. ) ) | JURY TRIAL DEMANDED |
| PRAGER METIS CPAs, LLC, ) ) | |
| Defendant. ) ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), for its

complaint against Prager Metis CPAs, LLC ("Prager Metis" or "Defendant"), alleges as follows:

## SUMMARY

1. In February 2021, Prager Metis undertook an audit of the financial statements of

FTX, then one of the world's largest crypto asset trading platforms.[1]  Less than two years later,

in November 2022, FTX collapsed, wiping out billions in investor equity and billions more in

misappropriated customer deposits.

2. Prager Metis was aware at the time that it began the engagement that FTX was

raising funds from equity investors, and that FTX intended to become a publicly traded

company.  Prager Metis issued two audit reports—in July 2021 and April 2022—stating that the

firm had conducted audits of the FTX financial statements, and that it had done so in accordance

with generally accepted auditing standards.  These statements were material to FTX equity

investors in connection with FTX's offer and sale of equity securities.  And Prager Metis knew

---

[1] As described in paragraph 13, FTX refers to FTX Trading Ltd. and various subsidiary entities, including FTX Digital Markets Ltd., a Bahamas company.

or should have known that the statements were not true:  its audits of FTX were not in fact conducted in accordance with Generally Accepted Auditing Standards ("GAAS").

3.     The foundational failure to meet GAAS stemmed from the fact that the Prager Metis engagement partner fundamentally did not understand FTX, or the crypto asset markets in which it operated.  In its rush to accept FTX as an audit client, Prager Metis assembled an engagement team that collectively lacked the competence, experience, and knowledge to appropriately conduct the audits.  From this initial failure flowed a series of other auditing failures in the design and execution of the audits.  These failures resulted in the issuance of audit reports that each contained an opinion that FTX's financial statements presented fairly, in all material respects, the financial position of FTX and its subsidiaries in accordance with accounting principles generally accepted in the United States of America (Generally Accepted Accounting Principles or "GAAP").  But, due to the auditing failures, Prager Metis lacked sufficient appropriate audit evidence to support those opinions.

4.     The most significant deficiency was Prager Metis's failure to understand FTX's relationship with Alameda Research LLC ("Alameda") (the trading firm belonging to FTX's founder and owner Sam Bankman-Fried) and the pivotal role Alameda played in FTX's business. Despite the interconnected nature of the companies and the significant financial transactions between them, Prager Metis and the audit engagement team failed to adequately assess the risk of material misstatement presented by the FTX-Alameda relationship.  As a result, the audit plan and procedures largely excluded Alameda.  Ultimately, the FTX-Alameda relationship was at the heart of the misappropriation of billions of dollars of FTX customer assets that led to the collapse of FTX in November 2022.

## **VIOLATIONS**

5.      By engaging in the conduct set forth in this Complaint, Defendant violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)].

6.      Unless Defendant is permanently restrained and enjoined, it may continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## **NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)].

8.      The Commission seeks a final judgment:  (i) permanently enjoining Defendant from engaging in the acts, practices, transactions and courses of business alleged herein; (ii) imposing civil money penalties on Defendant pursuant to Section 20(d) of the Securities Act; and (iii) ordering such other and further relief the Court may find appropriate.

## **JURISDICTION AND VENUE**

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v.  In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

10.      Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].  Specifically, one or more investors in FTX obtained

information regarding the audit of FTX's financial statements from Prager Metis while located in the Southern District of New York.

## DEFENDANT

11.    **Prager Metis CPAs, LLC** is an accounting and auditing firm headquartered in New York, New York, which has been registered with the Public Company Accounting Oversight Board ("PCAOB") since 2003.  Prager Metis provides accounting, auditing, consulting, and tax services to a variety of companies, including public issuers whose securities are registered with the Commission and trade in the U.S. markets.

## RELEVANT PARTIES AND ENTITIES

12.    The "**Engagement Partner**" was, at all relevant times, a Prager Metis equity partner auditing the financial statements of public and private companies.  He was the lead audit partner, known as the engagement partner, for the Prager Metis audits of FTX's financial statements.  At all relevant times, the Engagement Partner was acting within the scope of his employment.

13.    **FTX Trading Ltd. (d/b/a FTX.com)** is an Antigua and Barbuda limited corporation.  FTX Trading Ltd. and its subsidiary entities, including FTX Digital Markets Ltd. (a Bahamas company), are referred to collectively as "FTX."  FTX's principal place of business was in Hong Kong and The Bahamas.  FTX operated a global crypto asset trading platform and began operations in or around May 2019.  FTX was available to customers in most countries, but stated that it would not provide services to customers in the United States and several other countries.  On or about November 11, 2022, FTX and certain of its affiliates filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware.[2]

---

[2] FTX US is the d/b/a for a subsidiary of West Realm Shires Inc., a separate legal entity from FTX Trading Ltd. that provided different services, including to US customers.  FTX US's conduct is not the subject of this complaint.

14. **Alameda Research LLC** is a Delaware company that had operations in the United States, Hong Kong, and The Bahamas. Alameda Research LLC and its subsidiaries, including Alameda Research Ltd. (a British Virgin Islands company), are collectively referred to herein as "Alameda." Alameda was a quantitative trading firm specializing in crypto assets. With FTX, Alameda filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 22-11068 (Bankr. Del.).

## FACTS

### I. Prager Metis Audited the FTX Financial Statements.

#### A. Prager Metis Accepted the FTX Audit Engagement.

15. The Prager Metis Engagement Partner was introduced to Bankman-Fried in late January 2021. Bankman-Fried and the FTX team had been unsuccessful in their prior attempts to identify a firm that was willing to audit FTX's financial statements, and they were eager to obtain audited financial statements to support their plan of engaging in a public offering (which would generally require audited financial statements). FTX was also conducting private fundraising rounds with equity investors, who were also seeking audited financial statements as part of their diligence process.

16. The engagement moved forward quickly, with a "kick-off" meeting on or about February 8, 2021, before the internal Prager Metis client acceptance process was finalized. FTX sought to have the audit completed and an audit report released by April 2021 for its financial statements covering part of 2019 (from April 2019, when FTX began operations, to December 2019) and all of 2020. The Engagement Partner began assembling an engagement team, while pushing the internal Prager Metis client acceptance process forward toward completion.

17. During the internal client acceptance process, Prager Metis partners raised concerns to each other and the Engagement Partner about Prager Metis taking on a complicated,

first-time audit of a crypto industry client on an accelerated schedule, particularly at a time of year when their resources were heavily utilized (their "busy season"). Prager Metis partners also noted that taking on FTX as a client would be a high-risk engagement, that the firm lacked sufficient experience auditing crypto industry companies (and trading platforms in particular), and that they understood from FTX that its internal financial reporting function was virtually nonexistent. One Prager Metis partner emailed the Engagement Partner after the initial meeting with FTX noting that there appeared to be billions of dollars in unrecorded assets, that the financial statement information that had been circulated before the meeting appeared to be inaccurate, and that there were significant related-party transactions that had not been booked.

18.     The Engagement Partner was undeterred by these concerns. He acknowledged that staffing would be "somewhat on the fly," but advocated for moving forward quickly. The Engagement Partner brought in two outside contractors to assist with the audit, but they too lacked experience in auditing a crypto asset trading platform of the size and complexity of FTX. More importantly, they could not overcome the fundamental deficiencies in knowledge and competence of the Engagement Partner, who was ultimately responsible for directing and supervising their work.

19.     Prager Metis partners also raised questions specifically about the qualifications of the Engagement Partner to lead the engagement, and it was acknowledged that he had only recently developed limited experience in the industry. But despite this awareness, Prager Metis never conducted an adequate assessment of the Engagement Partner's capabilities. The firm thus failed to identify that the Engagement Partner was not competent to audit a large, complex crypto asset trading platform. He did not understand the basic technology behind crypto assets or the crypto asset industry. He lacked basic knowledge about foundational concepts, including crypto

wallets and blockchain technology.  He lacked knowledge of basic terminology regarding crypto

assets.  He lacked an understanding of the functionality of crypto asset trading platforms.  And

he had no awareness of prior, widely publicized, instances of crypto asset industry failures and

frauds.

20.     Despite policies and procedures at Prager Metis that were designed to evaluate

new client engagements, particularly those that were deemed high-risk, and even though

questions and concerns had been raised internally from the initial stages, Prager Metis accepted

FTX as a client.

21.     On February 17, 2021, FTX signed the engagement letter and formally engaged

Prager Metis as its independent auditor for its financial statements encompassing fiscal year

2020 and April to December of 2019.

**B.  Prager Metis Conducted Two Audits of FTX's Financial Statements.**

22.     The Prager Metis team conducted a series of video calls and obtained documents

from FTX from February 2021 through July 2021.  The Prager Metis team ultimately met, via

video call, multiple members of the FTX team, including Bankman-Fried and Nishad Singh, who

was initially Head of Engineering at Alameda and then became Head of Engineering at FTX,

while retaining his role and title at Alameda.  The Engagement Partner had the opportunity to

observe that the founders and senior leaders of FTX lacked significant business experience.  He

also had the opportunity to observe that the corporate structure at FTX was loose and informal.

23.     As discussed further below, the Engagement Partner was responsible for

designing and implementing audit procedures that identified the risks of material misstatements

in the FTX financial statements.  But because he did not understand FTX, or the crypto asset

industry generally, he failed to adequately assess the risks of material misstatements, and thus

failed to design and implement audit procedures to obtain sufficient appropriate audit evidence to

properly respond to those risks.  Significantly, the Engagement Partner failed to understand the relationship between FTX and Alameda, a related party, and the role that Alameda (and its employees) played in FTX's business.

24.     The Engagement Partner knew or should have known that Alameda, a quantitative trading firm specializing in crypto assets, was founded and owned by Bankman-Fried and Gary Wang, who also founded FTX.  Until October 2021, Bankman-Fried was the CEO of both FTX and Alameda.  FTX and Alameda shared a number of employees and resources and had offices in the same location.  The Engagement Partner was aware of the interrelated nature of the two companies, and even believed—incorrectly—that FTX did not have any employees at all, but rather that all employees at FTX were actually Alameda employees.

25.     Prager Metis requested that FTX complete a "Related Party Questionnaire," in which FTX disclosed certain services that Alameda provided to FTX, including a Payment Agent Agreement (in which an Alameda entity provided cash management services to FTX) and a Services Agreement (through which Alameda provided FTX with research and development services).  FTX provided documents that purported to memorialize these arrangements, which were executed, on behalf of both FTX and Alameda, by Bankman-Fried.

IN WITNESS WHEREOF the Parties hereto have executed this Agreement as of the day and year first above written.

**FTX TRADING LIMITED**

By: *Sam Bankman-Fried*

Name: Samuel Bankman-Fried

Title: CEO

**ALAMEDA RESEARCH LIMITED**

By: *Sam Bankman-Fried*

Name: Samuel Bankman-Fried

Title: CEO

*Ex. 1 Final Page of Services Agreement Provided to Prager Metis by FTX*

IN WITNESS WHEREOF, this Agreement was executed effective as of the date first set forth above.

**Provider:**                                        **"FTX"**

                                        FTX TRADING LTD., a company organized and existing under the laws of Antigua and Barbuda

Name of Provider: *Alameda Research LTD*          By: _____

                                        Name: *Sam Bankman-Fried*

By: _____                              Title: *CEO*

Name: *Sam Bankman-Fried*                        Effective Date: June 1, 2019

Title: *CEO*

*Ex. 2 Final Page of Payment Agent Agreement Provided to Prager Metis by FTX*

26.     Despite this and other information regarding the relationship between FTX and Alameda, Prager Metis lacked the basic understanding and competence required to evaluate the nature and scope of that relationship, and the potential impact on FTX's financial statements and footnote disclosures.

27.     There were numerous instances in which the Prager Metis team assessed

connections between FTX and Alameda in a cursory manner, without engaging in reasonable analysis of the related risks.  For instance, Prager Metis failed to understand and properly evaluate the risks posed by the fact that, during the periods covered by the financial statements Prager Metis audited, Alameda was a custodian of the cash deposited by FTX customers to fund their FTX trading accounts.  The Engagement Partner himself lacked a basic understanding of the flow of FTX customer funds, later explaining that he believed that FTX customers sent their cash (fiat currency) not into another bank account but rather directly "into the exchange" and "into the blockchain," which is not an accurate understanding of either blockchain technology or the processes employed at FTX.

28.     FTX had provided Prager Metis documents that showed that FTX customers who wished to fund their trading accounts with cash instead of crypto assets were instructed to wire the money to Alameda's bank accounts.  The engagement team thus had the information needed to plan an audit that included inquiries into the segregation and handling of those assets.  Those inquiries could have included, for example:  (1) whether the Alameda bank accounts holding FTX customer funds were custodial or "for the benefit of" accounts; (2) whether Alameda commingled FTX customer cash with its own cash; (3) how the custodial funds were reconciled to FTX's internal ledger; (4) what, if any, internal controls or processes existed to ensure that Alameda was a proper custodian of these FTX customer funds; and (5) whether there was an actual custodial agreement between Alameda and FTX governing this relationship.  But the audit plan did not cover or address these issues.

29.     Moreover, because Prager Metis did not understand Alameda's role as a purported custodian of cash belonging to FTX customers, its engagement team could not reasonably analyze FTX's decision not to recognize its customers' crypto assets or cash on its balance sheet.

And because the Engagement Partner did not understand basic aspects of FTX's business model, he failed to design an audit that included procedures to identify whether certain assets were appropriately recognized and presented in FTX's financial statements, and if included, whether they contained sufficient footnote disclosure.

30.     FTX told Prager Metis that it loaned funds to Alameda, but the Prager Metis team did not design and execute sufficient procedures to obtain audit evidence for this activity. Instead, Prager Metis memorialized the limited audit evidence they collected on this issue with this one-line workpaper:



*Ex. 3 Prager Metis Workpaper Regarding Alameda Borrowing*

31.     Prager Metis apparently inquired no further into the nature or extent of Alameda's borrowing, taking at face value the statement that Alameda—the company Bankman-Fried owned and that served as the primary market maker for FTX—operated under terms that were no different than those that would apply to an individual customer purchasing a small amount of bitcoin on margin for the first time.  Prager Metis took no steps to consider the size of the overall borrowing arrangement or consider the potential risks of a borrowing arrangement with a related party.  And because Prager Metis failed to understand the extent of Alameda's purported

borrowing of funds from FTX, the engagement team never understood or evaluated Alameda's unique ability to borrow virtually unlimited amounts from FTX, and how that ability to borrow might affect the accuracy of FTX's financial statements.

32.     Thus, because the Engagement Partner did not fundamentally understand FTX's business, its relationship with Alameda, or the crypto asset industry as a whole, he could not—and did not—develop and document an audit plan that adequately assessed the risks of material misstatement in the financial statements or update that plan as necessary during the audit. The Engagement Partner's lack of understanding about FTX and its relationship with Alameda, and the lack of professional skepticism regarding information that was provided regarding Alameda, effectively meant that—other than at a generally superficial level—Alameda was removed from the scope of the Prager Metis audit of FTX's financial statements.

33.     On July 30, 2021, FTX issued its first Consolidated Financial Statements, which covered 2020 and a portion of 2019. Prager Metis issued an accompanying Independent Auditor's Report, stating its opinion that the Financial Statements presented fairly, in all material respects, the financial position of FTX in accordance with GAAP. Prager Metis represented in the audit report that: "We conducted our audits in accordance with auditing standards generally accepted in the United States of America." The Independent Auditor's Report was signed in the name of Prager Metis, with the authorization of the Engagement Partner.

34.     The statements regarding the audits being conducted in compliance with GAAS were material to investors in the offering of equity investments in FTX. In fact, during the audit, a member of the Prager Metis engagement team was asked to speak to several prospective FTX investors about Prager Metis's audit, and did, in fact, speak to at least one prospective investor, in Manhattan. Moreover, the Engagement Partner also knew, or should have known, that the

audit report and the financial statements would be made available to current and prospective equity investors in FTX after they were issued and provided to FTX.

35.     In January 2022, Prager Metis began the audit of FTX's financial statements for the period ended December 31, 2021.  The engagement letter was signed on January 17, 2022. Prager Metis did not engage in a substantive review of the client continuation or analyze whether the engagement team had the competence to undertake another audit of FTX's financial statements.

36.     The Prager Metis engagement team for the second audit was substantially the same as the prior team, led by the Engagement Partner, and followed the same deficient processes as the prior audit.  The engagement team continued to accept and rely on superficial documentation and information regarding the role of Alameda in FTX's business.  The team used the same document describing Alameda's borrowing as in the prior year.  *See* Ex. 3, *supra.* They did so despite the fact that Prager Metis had received information that, in 2021, the purported related party receivable balance due from Alameda to FTX had risen from $0 to $1.2 billion.

37.     Despite the massive increase in that line item—indeed, $1.2 billion was approximately 44% of FTX's total assets in 2021—the Prager Metis engagement team failed to perform sufficient transaction testing of this balance.  Prager Metis moreover had access to FTX's account details, which indicated that this line item included several large, round-number transactions of hundreds of millions of dollars between FTX and Alameda.  These included two transactions of $400 million each, sent by FTX to an Alameda-controlled bank account that was used to misappropriate customer funds.  None of these transactions were subjected to any meaningful procedures to ascertain the purpose of these transactions.

38.     Instead, the engagement team relied wholly on (i) FTX management's assertion that the receivable related to a "treasury management agreement" between the two entities, and (ii) a statement by Bankman-Fried on April 2, 2022 confirming that $1.2 billion was the correct amount owed by Alameda to FTX as of December 31, 2021.



*Ex. 4  Confirmation of Alameda Related Party Receivable Balance, Signed by Bankman-Fried on Behalf of Alameda.  Red markings were added by Prager Metis during the audit process.*

39.     Thus, Prager Metis relied on another document signed by Bankman-Fried, this time on behalf of Alameda, to support a significant factual representation, and inquired no further into the borrowing.

40.     On April 2, 2022, FTX issued its 2021 financial statements, again accompanied by an audit report from Prager Metis.  Once again, the audit report stated Prager Metis's opinion that the Financial Statements and notes presented fairly, in all material respects, the financial position of FTX in accordance with GAAP.  Prager Metis again stated that:  "We conducted our audit in accordance with auditing standards generally accepted in the United States of America." And the audit report was again signed in the name of Prager Metis, with the authorization of the Engagement Partner.

41.     Prager Metis and the Engagement Partner knew or should have known that FTX continued to raise money from equity investors in 2022.  Moreover, Prager Metis's statements regarding the audits were material to equity investors, who generally consider the existence of properly audited financial statements as part of the information they consider in determining whether to invest in a company's securities.

42.     Prager Metis and the Engagement Partner continued to engage periodically with FTX and began discussing internally how to market the relationship in order to grow Prager Metis's business working with companies in the crypto industry.  They highlighted their experience in working with crypto companies on the Prager Metis website, including on the profile pages for certain partners.  In May 2022, the Engagement Partner began working with the Prager Metis marketing team to update the firm's crypto-related marketing materials, in advance of a "huge crypto conference upcoming."  He noted that Bankman-Fried was "one of the major influences in the crypto currency arena and we need to leverage our relationship with him."

43.    In late August 2022, Prager Metis contacted FTX to begin planning for the audit of FTX's 2022 financial statements.

### C.  FTX Collapsed in November 2022.

44.    In early November 2022, after a series of public statements, customer withdrawals, and frantic fundraising attempts, FTX collapsed.  On November 11, 2022, Bankman-Fried resigned from FTX.  Shortly thereafter, FTX and approximately 100 affiliated entities, including Alameda, filed for Chapter 11 bankruptcy protection.

45.    Prager Metis quickly moved to distance itself from the FTX engagement. References to the firm's crypto asset market engagements and experience were removed from the firm's website.

46.    Prager Metis senior management also reviewed the audit documentation from the FTX engagement and determined that neither the 2019/2020 nor the 2021 audit file had been officially finalized in the audit software program.  A number of individual workpapers contained no evidence of review by the Engagement Partner, and other workpapers contained open comments, with no evidence that the questions raised had been addressed.  One purportedly final workpaper—documenting the purchase price accounting for the single largest asset on FTX's fiscal year 2020 balance sheet—contained content cut-and-pasted from work performed on an entirely different Prager Metis client.  After management reviewed the files in November 2022, and realized that the electronic audit files had not been closed as required, they instructed the Engagement Partner to close the audit workpapers related to the FTX engagement.

47.    Government agencies, including the SEC, the Commodity Futures Trading Commission, and the Department of Justice, investigated FTX and its principals.  Bankman-Fried was charged in December 2022 by the SEC, the Commodity Futures Trading Commission, and the Department of Justice.  The SEC specifically alleged that, among other things,

unbeknownst to FTX's equity investors (and FTX's customers), from May 2019 through November 2022, Bankman-Fried, along with other FTX and Alameda executives, was orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds—largely through Alameda—for his own personal benefit and to help grow his crypto empire.[3]

## II.   Prager Metis's Claims that the Audits Were Conducted in Accordance with Generally Accepted Auditing Standards Were Not True.

### A.  Generally Accepted Auditing Standards Applied to Prager Metis and to the Engagement Partner.

48.     Prager Metis's audits of FTX's financial statements were governed by GAAS. GAAS is developed by the American Institute of Certified Public Accountants ("AICPA") Auditing Standards Board, and is issued in the form of Statements on Auditing Standards, which are codified into sections referred to as "AU-C" sections.  AU-C § 200.02.

49.     The purpose of a GAAS audit is to provide the users of financial statements with the auditor's opinion on whether the financial statements are presented fairly, in all material respects, in accordance with the applicable framework.  AU-C § 200.06.  Compliance with GAAS is what enables an auditor to form the opinion as to whether the financial statements are presented fairly.  *Id*.  GAAS contains both specific objectives and requirements, and the general requirement that an auditor exercise professional judgment and maintain professional skepticism throughout the planning and performance of an audit.  AU-C § 200.08.[4]

---

[3] Bankman-Fried was charged by the Commission on December 13, 2022, in *SEC v. Samuel Bankman-Fried*, 22-cv-10501 (S.D.N.Y.).  In the parallel criminal case, Bankman-Fried was convicted at trial of three counts of wire fraud, conspiracy to commit wire fraud, conspiracy to commit securities fraud, conspiracy to commit commodities fraud, and conspiracy to commit money laundering.  *See United States v. Bankman-Fried*, 22-cr-0673 (S.D.N.Y.).

[4] GAAS defines professional judgment as "[t]he application of relevant training, knowledge, and experience, within the context provided by auditing, accounting, and ethical standards, in making informed decisions about the courses of action that are appropriate in the circumstances of the audit engagement."  AU-C § 200.14.  GAAS defines

50.     GAAS itself requires that an auditor conduct an audit in accordance with GAAS, by understanding and complying with all relevant AU-C sections.  AU-C §§ 200.20, .21.  GAAS requires that an auditor should not represent compliance with GAAS in the auditor's report unless the auditor has in fact complied with the relevant requirements.  AU-C § 200.22.

51.     Compliance with a firm's system of quality control when conducting an audit of financial statements is a foundational requirement in GAAS.  *See generally* AU-C § 220.

52.     It is the responsibility of the audit firm to ensure that quality control systems, policies, and procedures are in place.  AU-C § 220.03.  Specifically, GAAS provides that an audit firm has, pursuant to guidance provided under the Statements on Quality Control Standards ("SQCS" or "QC"), "an obligation to establish and maintain a system of quality control to provide it with reasonable assurance that (a) the firm and its personnel comply with professional standards and applicable legal and regulatory requirements and (b) reports issued by the firm are appropriate in the circumstances."  AU-C § 220.03, discussing QC §§ 10.01, .03, and .12.

53.     GAAS also recognizes that an auditor is subject to relevant ethical requirements relating to financial statement audit engagements, including those promulgated by the AICPA Code of Professional Conduct.  AU-C §§ 200 A.15, A.16.

54.     During the relevant period, Prager Metis had a number of quality control policies and procedures in place and was aware of its responsibility to obtain reasonable assurance that its auditors, including the FTX engagement team, were complying with professional standards, including GAAS and the AIPCA Code of Professional Conduct.  QC §§ 10.01, .03, .04, .05, .13, and .21.  But Prager Metis failed to adequately meet its responsibility to maintain, implement, and monitor compliance with those policies and procedures.  As a result of the deficiencies in the

---

professional skepticism as "[a]n attitude that includes a questioning mind, being alert to conditions that may indicate possible misstatement due to fraud or error, and a critical assessment of audit evidence."  AU-C § 200.14.

maintenance, implementation, and monitoring of the firm's quality control systems, Prager Metis failed to prevent or detect the Engagement Partner's failures to comply with GAAS, as described further below.  Thus, Prager Metis's statement in its audit reports—"We conducted our audits in accordance with auditing standards generally accepted in the United States of America"—was both material to investors and not true.

55.     The GAAS failures included both the overarching failures to apply professional skepticism and professional judgment and to act with due care, as well as specific failures in interrelated areas, including:  (1) client acceptance, (2) engagement staffing, (3) audit planning and execution, and (4) audit documentation.

**B.  Prager Metis Violated GAAS When It Accepted an Engagement to Audit FTX's Financial Statements, a Client It Did Not Adequately Understand.**

56.     Prager Metis's initial acceptance of the FTX engagement was a foundational failure of GAAS that led to the other failures.  A threshold requirement of auditing professional standards is that an auditor and audit firm not accept an engagement unless the firm has the competence and capabilities to do so.  Specifically, the quality control standards provide that audit firms should undertake new audit engagements—and continue preexisting ones—only when the firm is competent to perform the engagement and has the capabilities, including the time and resources, to do so.  QC § 10.27.

57.     During the relevant period, Prager Metis had a client acceptance policy in place that mirrored this standard, which stated that Prager Metis "will accept and continue only client relationships and specific engagements when it has determined that the requisite competence and capabilities (including adequate time and resources) exist within the Firm to perform the engagement."

58.     Moreover, the Engagement Partner was specifically required under GAAS to

undertake this analysis before accepting the engagement.  AU-C § 220.14.  ("The engagement partner should be satisfied that appropriate procedures regarding the acceptance and continuance of client relationships and audit engagements have been followed and should determine that conclusions reached in this regard are appropriate."); *see also* AU-C § 220.17 ("The engagement partner should take responsibility for … [t]he direction, supervision, and performance of the audit engagement in compliance with professional standards, applicable legal and regulatory requirements, and the firm's policies and procedures.").

59.     As described above, however, Prager Metis failed to effectively implement its own policies and procedures for client acceptance and failed to detect the Engagement Partner's lack of compliance with GAAS.  There was never an adequate assessment of whether the Engagement Partner and the engagement team were competent to perform the audit.  Instead, despite individuals voicing concerns, including to the Engagement Partner, the audit simply proceeded.

60.     Prager Metis partners had concerns that they expressed to each other and/or to the Engagement Partner directly regarding the Engagement Partner's capabilities, the firm's resources to conduct the audit, the timing of the audit, and FTX-specific issues.  But the concerns were never adequately addressed.  Instead, the Engagement Partner pushed ahead with the client acceptance process as if it were a formality, securing the engagement and beginning work without conducting a reasonable analysis of the competence and capabilities of the engagement team to conduct the audit, in direct violation of GAAS.

### C. The Prager Metis Team Lacked the Competence and Capabilities to Undertake the Audit But Did So Anyway, in Violation of GAAS.

61.     The lack of meaningful analysis at the client acceptance stage was itself a significant failure because, had an adequate analysis been done, it would have been clear that

both the Engagement Partner and the engagement team lacked the competence to conduct the audit.

62.    The Engagement Partner was required by GAAS to conduct the audit with due care, which required him to have the appropriate competence and capabilities to perform the work.  AU-C § 200A.19 ("Due care requires the auditor to discharge professional responsibilities with competence and to have the appropriate capabilities to perform the audit and enable an appropriate auditor's report to be issued.").  GAAS acknowledges that due care is a fundamental principle of professional ethics under the AIPCA Code of Professional Conduct.  AU-C § 200A.16.

63.    Prager Metis was required to comply with GAAS through establishing quality control policies and procedures to ensure that the Engagement Partner had the appropriate competence, capabilities, and authority to perform the audit.  AU-C § 220.03; QC §§ 10.33b, 10.34a; *see also* QC § 10.A11 ("Consideration of whether the firm has the competence, capabilities, and resources to undertake a new engagement … involves reviewing the specific requirements of the engagement … including whether firm personnel have knowledge of relevant industries or subject matters or the ability to effectively gain the necessary knowledge.")

64.    Despite these requirements, the Engagement Partner proceeded without exercising due care, conducting an audit he lacked the competence to lead.  And Prager Metis failed to prevent him from doing so, allowing the Engagement Partner to proceed without properly assessing whether the assembled engagement team had the required competence, capabilities, and resources.

65.    As described above, the Engagement Partner lacked even a basic understanding of crypto assets, and how that technology operated in connection with the FTX trading platform.

And while he brought on contractors intended to address his lack of relevant experience and

knowledge regarding the crypto asset industry and crypto trading platforms, the Engagement

Partner still had the responsibility under GAAS for the direction, supervision, and performance

of the audit engagement to ensure it was conducted in compliance with professional standards,

applicable legal and regulatory requirements, and the firm's policies and procedures.  AU-C

§ 220.17.  But because he himself did not gain a reasonable understanding of how FTX operated

or how crypto technology worked in general, the Engagement Partner could not effectively

supervise members of his engagement team.

66.    The Engagement Partner thus failed to exercise due care, in violation of GAAS,

by moving forward with the audit of FTX's financial statements, and Prager Metis failed to

implement and monitor its policies and procedures to ensure that the Engagement Partner and

team had the competence and capabilities to perform the engagement.

### D.  In Violation of GAAS, Prager Metis Failed to Design and Execute an Audit that Appropriately Assessed the Risks of Material Misstatements.

67.    The decision to take on a client they did not understand and lacked the

competence to audit then led to additional GAAS violations by Prager Metis at the design and

execution phases of the audit.  This included both overarching failures and specific failures.

68.    The overarching failure, which ran throughout the design and execution process,

was the failure of the Engagement Partner and the engagement team to exercise professional

judgment and to perform the audit with professional skepticism, in violation of GAAS.  AU-C

§§ 200.17, 200.18.  As a result, the auditors did not have the basis to form the opinion that the

financial statements were presented fairly, in all material respects, in accordance with GAAP, as

required by GAAS.  AU-C § 200.04.

69.    The auditing flaws in the design and execution stage can again be traced back to

the Engagement Partner's fundamental lack of understanding of FTX and the crypto asset markets more broadly.  GAAS specifically requires that, in order to design and perform audit procedures that identify and assess the risks of material misstatement, an auditor has to understand the entity and its environment.  AU-C § 315.  Among other relevant requirements, an auditor is required to understand relevant industry, regulatory, and other external factors; the nature of the entity and its operations; and the way it is structured.  AU-C § 315.12.

70.     As discussed above, the Engagement Partner failed to understand crypto asset markets, crypto asset trading platforms, and FTX as an entity.  He failed to exercise professional judgment in even taking on the engagement.  He failed to educate himself about the industry and the entity in order to develop the knowledge he needed to understand how to design and execute the audit.  As a result, he failed to understand significant issues relating to FTX's financial statements.

71.     The failure to understand FTX was also evident in the failure to obtain an understanding of "the control activities relevant to the audit … [which are those] necessary to understand in order to assess the risks of material misstatement," as specifically required under GAAS.  AU-C § 315.21.  It was evident from the start of the audit that the individuals running both FTX and Alameda lacked significant business experience, and the engagement team knew or should have known that the corporate structure was loose and informal.  But the engagement team failed to exercise professional skepticism or professional judgment in considering FTX's control environment in its risk assessment process.

72.     As discussed above, the most impactful aspect of the Engagement Partner's failure to understand FTX was his failure to understand FTX's relationship with Alameda.  GAAS specifically recognizes that, in exercising professional judgment about significant risks,

an auditor should give special consideration to related party relationships and transactions. AU-C §§ 315.29, 550. And, as noted above, the issue of FTX-related parties was flagged by a Prager Metis partner before the engagement even officially commenced, when he noted that there appeared to be significant related party transactions that had not been booked. GAAS specifically notes that "related party transactions may be motivated solely or in large measure to engage in fraudulent financial reporting or conceal misappropriation of assets." AU-C § 550.03.

73.     GAAS explains why understanding related party relationships and transactions are so important to an audit: "Because related parties are not independent of each other, financial reporting frameworks establish specific accounting and disclosure requirements for related party relationships, transactions, and balances to enable users of the financial statements to understand their nature and actual or potential effects on the financial statements. Therefore, the auditor has a responsibility to perform audit procedures to identify, assess, and respond to the risks of material misstatement arising from the entity's failure to appropriately account for or disclose related party relationships, transactions, or balances." AU-C § 550.04. "In addition, an understanding of the entity's related party relationships and transactions is relevant to the auditor's evaluation of whether one or more fraud risk factors are present … because fraud may be more easily committed through related parties." AU-C § 550.05.

74.     Moreover, GAAS specifically recognizes that planning and performing an audit with professional skepticism is particularly important in the context of related party transactions, given the potential for undisclosed related party relationships and transactions. AU-C § 550.07.

75.     Despite these specific requirements, which make explicit the importance of applying the concept of professional skepticism in analyzing related party transactions, the Engagement Partner and engagement team failed to adequately assess the risk of material

misstatement arising from the relationship between Alameda and FTX.  The team memorialized the information regarding Alameda's borrowing in a perfunctory, one-line document.  In addition, the team accepted without further investigation agreements that were signed by Bankman-Fried on behalf of both FTX and Alameda, and a one-page document that essentially amounted to an I.O.U. between the two companies, both owned by Bankman-Fried.

76.     Professional skepticism calls for a questioning mind, but the engagement team appears to have simply accepted these representations and documents at face value.  Similarly, the large and exponentially increasing transactions between FTX and Alameda, including in large round-value numbers, were accepted by the engagement team without meaningful inquiry or re-engaging in the risk assessment process.  Because Prager Metis failed to design and execute an audit that appropriately assessed the risks of material misstatements, it failed to obtain the sufficient appropriate audit evidence necessary to support its opinions that FTX's financial statements were presented fairly, in all material respects, in compliance with GAAP.  Accordingly, the firm's representation in its audit report that it complied with GAAS was not true.

### E.  Prager Metis Failed to Properly Document the Purportedly Completed Audits, in Violation of GAAS.

77.     Prager Metis's failure to meet its professional responsibilities continued through November 2022.  GAAS requires audit documentation to be finalized within 60 days of the date of the release of the report.  AU-C § 230.16.  And the firm is required under the SQCS to establish policies and procedures for engagement teams to complete the assembly of final engagement files on a timely basis after the engagement reports have been released.  QC § 10.49.

78.     But once again, while Prager Metis had quality control policies and procedures in place that required its engagement teams to comply with GAAS, the FTX engagement team did

not do so, and the firm failed to implement its own policies to ensure compliance.  As described above, the electronic process of closing the audit workpapers for both audits were finalized only after FTX collapsed, in November 2022.

79.      In addition, the overall nature of the audit documentation itself—for example, the open comments and the cut-and-paste response—exhibited a lack of due care on the part of the Engagement Partner and the firm, in violation of GAAS.  AU-C § 200.16.

80.      Thus, from the inception to the end, Prager Metis's audits of FTX failed to comply with GAAS, and its statements to the contrary in the audit reports were not true.

<u>**FIRST CLAIM FOR RELIEF**</u>

**NEGLIGENCE-BASED FRAUD IN THE OFFER OR SALE OF SECURITIES**

**(Violations of Sections 17(a)(2) and (3) of the Securities Act)**

81.      The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 80.

82.      By reason of the conduct described above, on or about July 30, 2021, Defendant, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting negligently, (i) obtained money or property by means of an untrue statement of a material fact; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

83.      By reason of the conduct described above, Defendant violated Securities Act Sections 17(a)(2) and (a)(3) [15 U.S.C. §§ 77q(a)(2) and (a)(3)].

## SECOND CLAIM FOR RELIEF

## NEGLIGENCE-BASED FRAUD IN THE OFFER OR SALE OF SECURITIES

### (Violations of Sections 17(a)(2) and (3) of the Securities Act)

84.     The Commission re-alleges and incorporates by reference the allegations

contained in paragraphs 1 through 80.

85.     By reason of the conduct described above, Defendant, on or about April 2, 2022,

in connection with the offer or sale of securities, by the use of the means or instrumentalities of

interstate commerce or of the mails, directly or indirectly, acting negligently, (i) obtained money

or property by means of an untrue statement of a material fact; and (ii) engaged in acts, practices,

or courses of business which operated or would operate as a fraud or deceit upon any persons,

including purchasers or sellers of the securities.

86.     By reason of the conduct described above, Defendant violated Securities Act

Sections 17(a)(2) and (a)(3) [15 U.S.C. §§ 77q(a)(2) and (a)(3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final

Judgment:

A.     Permanently restraining and enjoining Defendant, its officers, agents, servants,

employees and attorneys, and those persons in active concert or participation with it who receive

actual notice of the injunction by personal service or otherwise, and each of them, from violating

Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (a)(3)];

B.     Ordering Defendant to pay civil monetary penalties pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)]; and

C.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands trial by jury.

DATED: September 17, 2024

Respectfully submitted,

*/s/ Amy Harman Burkart*
Amy Harman Burkart
David J. D'Addio
SECURITIES AND EXCHANGE
  COMMISSION
*Attorneys for the Plaintiff*

Of Counsel
Jorge G. Tenreiro
Michael Brennan
Amy Flaherty Hartman
Devlin Su

28